IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Carol Lethea Williams,<br><br>                Plaintiff,<br><br>vs.<br><br>Nancy A. Berryhill, Acting<br>Commissioner of Social Security,<br><br>                Defendant. | Civil Action No. 6:16-1010-JMC-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on April 25, 2013, alleging that she became unable to work on September 25, 2010. Both applications were denied initially and on reconsideration by the Social Security Administration. On November 4, 2013, the plaintiff requested a hearing. At the hearing, the plaintiff amended the alleged onset date to September 8, 2012. The administrative law judge ("ALJ"), before whom the plaintiff and J.

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

Adger Brown, an impartial vocational expert, appeared on October 29, 2014, considered the case *de novo*, and on November 21, 2014, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.[2] The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on February 9, 2016. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

>   (1) The claimant meets the insured status requirements of the Social Security Act through March 31, 2016.
>
>   (2) The claimant has not engaged in substantial gainful activity since September 8, 2012, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).
>
>   (3) The claimant has the following severe impairments: diabetes mellitus, lumbar and cervical degenerative disc disease, and osteoarthritis (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
>   (4) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).
>
>   (5) After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except she is precluded from climbing ropes, ladders, and scaffolds, but may occasionally balance, stoop, crouch, crawl, kneel, and climb ramps and stairs. She is precluded from performing overhead reaching with the right upper extremity, but is unlimited in reaching in other directions. She must avoid all exposure to hazards.

---

[2] There have been two prior unfavorable decisions issued by ALJs: the first on September 24, 2010, and the second on September 7, 2012 (Tr. 13).

2

(6) The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7) The claimant was born on May 22, 1962, and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8) The claimant has a limited education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11) The claimant has not been under a disability, as defined in the Social Security Act, from September 8, 2012, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

Under 42 U.S.C. § 423(d)(1)(A), (d)(5) and § 1382c(a)(3)(A), (H)(i), as well as pursuant to the regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that meets or medically equals an impairment contained in the Listing of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1, (4) can perform his past relevant work, and (5) can perform other work. *Id.* §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A claimant must make a *prima facie* case of disability by showing he is unable to return to his past relevant work because of his impairments. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). Once an individual has established a *prima facie* case of disability, the burden shifts to the Commissioner to establish that the plaintiff can perform alternative work and that such work exists in the national economy. *Id.* (citing 42 U.S.C. § 423(d)(2)(A)). The Commissioner may carry this burden by obtaining testimony from a vocational expert. *Id.* at 192.

Pursuant to 42 U.S.C. § 405(g), the court may review the Commissioner's denial of benefits. However, this review is limited to considering whether the Commissioner's findings "are supported by substantial evidence and were reached through application of the correct legal standard." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* In reviewing the evidence, the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id*. Consequently, even if the court disagrees with Commissioner's decision, the court must uphold it if it supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 50 years old on her amended alleged onset date (September 8, 2012) and was 52 years old on the date of the ALJ's decision (November 21, 2014). She has an eleventh grade education and past relevant work as a housekeeper and housekeeping supervisor (Tr. 18-19, 62).

Prior to the relevant period, the plaintiff saw primary care provider Shubin Ling, M.D., and his associates at Medical University of South Carolina ("MUSC") Health for management of her diabetes, hypertension, hyperlipidemia, neck pain, and osteoarthritis in her knees between October 2009 and May 2012 (Tr. 484-554). On January 5, 2010, the plaintiff was seen for a followup appointment for diabetes (Tr. 546). On February 3, 2010, the plaintiff had an ophthalmology appointment and stated that she sometimes had a sharp pain in her right eye (Tr. 576). On February 10, 2010, the plaintiff reported chronic back pain. She had tenderness to palpation around T8-L1 as well as some paraspinal tenderness. She had positive straight leg raising tests bilaterally. She was unable to sleep at night because of the pain and Ultram was prescribed. An MRI showed L5-S1 foraminal narrowing (Tr. 542-44). On June 23, 2010, the plaintiff was seen for neck pain, diabetes, hyperlipidemia, and C4-5 and C5-6 pain. The Ultram prescription was increased (Tr. 534-36). On September 24, 2010, the plaintiff's A1C level increased to 11. She also had neck pain (Tr. 529-31). On November 5, 2010, the plaintiff reported tingling in her foot. Her blood sugars were improved, but she was diagnosed with diabetic neuropathy and prescribed gabapentin (Tr. 525-27).

On January 28, 2011, the plaintiff reported continued neck pain and neuropathic pain in her legs. Naprosyn and Ultram were prescribed (Tr. 521-23). On February 7, 2011, the plaintiff saw the ophthalmologist and reported a sandy sensation in her eyes and blurry vision with increased blood sugars (Tr. 568). On March 1, 2011, the plaintiff stated that an increase in Neurontin had not really helped her leg pain (Tr. 516-18).

5

On July 4, 2011, the plaintiff was seen in the emergency department at Mount Pleasant Hospital for a headache. She also had left side abdominal pain. She became weak and felt nauseated and developed a headache. It was noted that the plaintiff was anxious (Tr. 334-52).

On August 15, 2011, the plaintiff reported to MUSC Health that she had left hip pain for three days. Her pain radiated down her left leg. She was diagnosed with sciatica. Due to peripheral neuropathy, the doctor increased her Neurontin to 300mg (Tr. 506-508). On November 8, 2011, the plaintiff had ongoing left hip and lower back pain. She had some radiation of pain down her left leg. Ultram and Neurontin did not provide relief. Her activity level had been significantly restricted by the pain. She had pain on movement of the left femoral head on rotation, tenderness to palpation over the left lower back and hip, and a straight leg raise test elicited pain down her left leg. Ultram and Neurontin made her sleepy and only minimally helped (Tr. 498-500). On November 15, 2011, the plaintiff was seen for diabetes and chronic low back pain. The pain in her left hip and lumbar spine continued. An x-ray of the left hip and lumbar spine showed degenerative disk disease of L4-L5 and L5-S1 and osteoarthritic changes of the hips, left greater than right. She was referred to physical therapy (Tr. 497).

On January 12, 2012, the plaintiff presented to East Cooper Medical Center based on left flank pain. A CT scan of her abdomen and pelvis showed moderate degenerative changes in her lower lumbar spine (Tr. 316).

On April 4, 2012, the plaintiff went to East Cooper Medical Center after falling the day before. An x-ray of her left knee was normal (Tr. 318).

The plaintiff returned to MUSC Health on May 21, 2012, with chronic neck pain and right knee pain. The doctor indicated that her knee pain was likely related to osteoarthritis and would refer her to physical therapy, but she could not afford it (Tr. 484-87). The plaintiff denied muscle weakness, decreased range of motion, and gait

disturbance, and she had normal strength and no neurological deficits on examination (Tr. 486). Medication managed her hypertension and hyperlipidemia. Dr. Ling prescribed tramadol as needed for knee pain (Tr. 487). In June 2012, the plaintiff's diabetes was uncontrolled (Tr. 479, 471).

The plaintiff met with a diabetes educator three times in June and August 2012 (Tr. 465-83). The diabetes educator noted a long history of uncontrolled type 2 diabetes with non-compliance and discussed management with monitoring blood sugar, taking insulin as prescribed, watching her diet, and exercising regularly (Tr. 465, 467, 471, 475-76, 480-81). The plaintiff had no functional limitations (Tr. 466, 472, 480).

Dr. Ling noted several times that the plaintiff had a history of uncontrolled type 2 diabetes mellitus with poor compliance with her prescribed treatment regimen, especially with monitoring her blood sugar and taking insulin (Tr. 491, 493, 505, 508-09, 511, 518, 523, 531, 536, 540). The plaintiff received her medication from the pharmacy at MUSC and did not pay for her insulin (Tr. 505). Dr. Ling and his associates informed the plaintiff of the long-term complications of poorly controlled diabetes, such as retinopathy, renal failure, dialysis, stroke, and amputation (Tr. 509, 518).

On August 11, 2012, the plaintiff was treated at the Mount Pleasant Hospital emergency room for neck and back pain, which had been worse for the last two days (Tr. 335, 356). The plaintiff reported a six-year history of neck and back pain (Tr. 356). Examination of her neck revealed local paraspinous tenderness with associated muscle spasms, exacerbated by neck movements. A lumbar spine examination revealed local tenderness with paraspinous muscle spasms, worsened with movement and twisting of the lower back. X-rays showed moderate spondylosis, greatest at C5-C6. The emergency room physician indicated that the plaintiff should not sit, drive, or stand in one place for more than 30 minutes at a time. She should not bend over or lift anything over 20 pounds. She should not reach or do overhead work (Tr. 335-58, 362, 386-87).

7

On October 4, 2012, the plaintiff returned to the emergency room and reported chest pain (Tr. 337, 367-68). She had a regular cardiac rate and rhythm; hypertension; brisk capillary refill; symmetric reflexes with normal muscle strength and tone; and a normal lower extremity examination without edema or tenderness (Tr. 367-68). An EKG was normal (Tr. 373), and an x-ray revealed no acute cardiopulmonary process (Tr. 388). The plaintiff was diagnosed with hypertensive disorder, gastroesophageal reflux disease ("GERD"), and atypical chest pain (Tr. 368). The plaintiff was given troponin, baby aspirin, pain medication, and gastrointestinal medication (Tr. 369, 373). She was discharged in an improved condition and prescribed Zantac for GERD (Tr. 373).

On October 24, 2012, the plaintiff's diabetes was uncontrolled, and she reported that she did not have insurance and cost was an issue in affording her glucose monitoring strips (Tr. 457). She continued to meet with a diabetes educator, Lindsay Meadowcraft, Pharm.D., between October 2012 and January 2013 (Tr. 441-48, 457-64). Dr. Meadowcraft noted that the plaintiff had an extensive history of uncontrolled diabetes (Tr. 441, 445, 459). The plaintiff repeatedly reported not following her prescribed regimen for monitoring her blood sugar levels and taking insulin (Tr. 441, 445, 457, 459, 461). Dr. Meadowcraft discussed compliance with her monitoring and medication regimen, management of her diet, and need for regular exercise (Tr. 436, 439, 443, 447, 461). Dr. Meadowcraft noted no functional limitations, except the plaintiff walked with a cane and the plaintiff's report that she no longer walked for exercise due to right leg and back pain (Tr. 439, 443, 447).

On December 14, 2012, the plaintiff established primary care with Martin Smith, M.D., at MUSC Health (Tr. 449). At that time, the plaintiff's diagnoses included uncontrolled type 2 diabetes mellitus, peripheral autonomic neuropathy due to diabetes mellitus, hypertension, hyperlipidemia, osteoarthirits in the knees, and neck pain (Tr. 449, 452-53). She had a normal physical examination, including normal pulses, normal

extremities without cyanosis or edema, and no neurological deficits (Tr. 451-52). The plaintiff reported taking metformin regularly, but missing doses of insulin (Tr. 449). Dr. Smith noted the plaintiff's poor compliance with her diabetes medication regimen (Tr. 452). Dr. Smith adjusted her insulin dosage and encouraged compliance with diet and with her appointments with the diabetes educator (Tr. 452). The plaintiff continued to take gabapentin (600 mg three times a day) (Tr. 451), and Dr. Smith noted that it had helped some with her peripheral autonomic neuropathy due to diabetes (Tr. 453). The plaintiff tolerated her hypertension medication well and had no symptoms of elevated blood pressure (Tr. 449). Dr. Smith restarted her hypertension medication as the plaintiff recently finished her last refill (Tr. 452). The plaintiff reported taking ibuprofen daily for joint pain (Tr. 449). She also took tramadol as needed for osteoarthritis-related knee pain (Tr. 451, 453).

On March 14, 2013, the plaintiff saw Dr. Smith for a routine followup appointment. She had arthralgia, particularly in her left knee and lower back. She had peripheral autonomic neuropathy due to diabetes and uncontrolled diabetes. She had not been walking due to pain in her leg and back and was walking with a cane. She noted some tingling in her hands (Tr. 429-39). The plaintiff's physical examination was normal and unchanged since December 2012 (Tr. 430, 451-52). Dr. Smith noted that the plaintiff's diabetes remained uncontrolled, and he encouraged compliance with monitoring her blood sugar, following her medication regimen, controlling her diet, and engaging in regular exercise (Tr. 431). Dr. Smith noted that the plaintiff received gabapentin through "PAP" and that it helped with tingling and pain in her feet (Tr. 429). Dr. Smith continued gabapentin at the same dosage. Dr. Smith increased the dosage of the plaintiff's hypertension medication. The plaintiff said she could not afford her hyperlipidemia medication, and Dr. Smith ordered lipid testing. The plaintiff continued to take tramadol periodically for knee pain (Tr. 431).

On June 8, 2013, the plaintiff was seen in the Mount Pleasant Hospital emergency room for abdominal pain (Tr. 339, 378). The plaintiff had full range of motion and no tenderness in her back; she was neurovascularly intact with equal pulses and no cyanosis; and she was neurologically intact with a normal gait (Tr. 341). A CT scan of the plaintiff's abdomen and pelvis was normal (Tr. 384). She was given Zofran for abdominal pain and discharged in good condition (Tr. 343).

On June 14, 2013, the plaintiff returned to Dr. Smith for a followup appointment. The plaintiff was so anxious at her appointment that she became nauseated and vomited at the beginning of her visit. She had joint pain and neck pain. She reported missing an insulin injection at least once a week, walking a block without difficulty, and having limitations more due to low back and left knee pain than chest pain or shortness of breath, which she denied having. She also reported difficulty paying for prior laboratory testing and novolog, but she had help obtaining gabapentin. The plaintiff had a normal physical examination with normal extremities with no cyanosis or edema. The plaintiff tolerated her hypertension medication well and had no signs of elevated blood pressure; Dr. Smith continued the plaintiff on lisinopril. Dr. Smith continued the plaintiff on simvastatin for hyperlipidemia as the plaintiff denied any side effects or interactions with her other medications. For her type 2 diabetes mellitus with diabetic neuropathy, Dr. Smith transitioned the plaintiff to novolin and continued the plaintiff on metformin and gabapentin (with no change in dosage), which helped with her peripheral neuropathy symptoms. The plaintiff continued to take tramadol as needed for back and knee pain, and Dr. Smith refilled this prescription. Dr. Smith also indicated that he sent all of the plaintiff's prescriptions to a pharmacy that had a broad generic formulary at low costs. Dr. Smith also referred the plaintiff to a provider that had a sliding scale to help with the cost of her laboratory tests (Tr. 424-27).

State agency physicians Ellen Humphries, M.D., and Stephen Wissman, M.D, each conducted reviews of the plaintiff's record in August and October 2013, respectively. They both assessed she could perform a limited range of light work involving standing and/or walking for six hours per workday, sitting about six hours per workday, and occasional postural activities (Tr. 97-99, 117-18). As part of their review, Drs. Humphries and Wissman specifically considered that the plaintiff's diabetes was poorly controlled; she had neuropathy as a complication of her diabetes; she took medication that improved her neuropathy symptoms; and she had a normal gait and good range of motion (Tr. 98, 118).

Between October 2013 and July 2014, the plaintiff received primary care from multiple providers at Franklin C. Fetter Family Health Center for uncontrolled type 2 diabetes mellitus, peripheral neuropathy, hypertension, hyperlipidemia, GERD, and arthritis (Tr. 600-10). The plaintiff continued to take insulin (with some adjustments to the type of insulin and dosage), metformin, gabapentin, lisinopril, simvastatin, amlodipine, aspirin, omeprazole, and tramadol (Tr. 427, 600, 602, 605, 607, 609). Naproxen was added for arthritic pain, and she was referred to a podiatrist for a foot callus in February 2014, although she had to wait until she had insurance (Tr. 602). The plaintiff's providers encouraged her to continue monitoring her blood sugar regularly and taking insulin as prescribed (Tr. 602).

On September 3, 2014, the plaintiff was seen at East Cooper Medical Center for osteoarthritis and lumbar radiculopathy with sciatica. She was advised to stop taking Naproxen and start taking Mobic and Narco (Tr. 611-12).

On September 15, 2014, R. Blake Dennis, M.D., at Southeastern Spine Institute, evaluated the plaintiff. She had chronic back pain and was referred to Dr. Dennis from the emergency department. The plaintiff's x-rays of the lumbar spine showed disc space narrowing at L3-4, L4-5, and L5-S1, but no spondylolisthesis, lytic or blastic destructive areas, or instabilities. She had lumbar degenerative disc disease and spinal

11

stenosis. The plaintiff had a normal gait, full range of motion in her hips and knees, negative straight leg raise test, negative femoral stretch, normal strength in her lower extremities, symmetrical reflexes, but a downgoing Babinski reflex. A pelvic x-ray showed no arthritis or fracture. Dr. Dennis recommended an MRI (Tr. 630).

The plaintiff saw Marshall Kalinsky, DPM, of Roper St. Francis Physician Partners, twice for complaints of left foot pain in October 2014. The plaintiff had normal vascular, neurologic, dermatologic, and musculoskeletal examinations, but she reported plantar pain. Dr. Kalinsky diagnosed the plaintiff with plantar fascial fibromatosis and initiated a "conservative therapy." At her followup appointment the same month, Dr. Kalinsky noted "much improvement" with taping, dispensed a power step device, and instructed the plaintiff to follow up only as necessary (Tr. 626-29).

At the administrative hearing, the plaintiff testified she had not driven for three years. Her children drove her places because of her pain and diabetes. She would get dizzy and feel bad and did not want to take any chances (Tr. 32-33). The ALJ asked the plaintiff about her medications. Side effects included lightheadedness, sweating, and dizziness. The plaintiff woke up at 7:00 a.m. She did not perform any household chores. Her children did the chores, the cooking, and the laundry. She would try to dust or fold the laundry. The plaintiff went with her daughter shopping about once a month. She left the house to go to the doctor or to pay bills with her daughter. She could not lift more than 15 pounds or she would have pain in her back and in her neck. The plaintiff estimated that she could walk half a mile before she would get dizzy and tired. She could stand or sit in one place for about 10 to 15 minutes before she would have pain. Her pain was in her neck and down into her lower back. She also had pain in her left knee, and sometimes she would experience stiffness in her hands. Her daily pain was a nine without medications and an eight with medications. The plaintiff experienced good days and bad days. On bad days, she just wanted to be left alone. On a good day, she had some relief from her pain. Half

12

of her days were good and half were bad. She went to bed at 8:00 p.m. She woke up three times in a night (Tr. 40-46).

The plaintiff testified that she left school in the 11th grade because her mother was sick. She had also failed some grades and had problems reading. She could write a little bit, but not very well. The plaintiff stated that she could carry a gallon of milk to her car, but it would cause pain. The plaintiff was using a cane, and she testified that she used the cane every day. By the time she walked from the parking lot to the hearing room, she had pain. The plaintiff's representative noted that the plaintiff was moving around in her chair and told her she could stand if she was uncomfortable. The doctors told her that they would not perform surgery on her back or her neck because it would not help because she was diabetic (Tr. 46-55).

The plaintiff testified that she had numbness and pain in her feet, and she could not wear regular shoes. She wore flip-flops. Her knee pain had gotten worse since a normal x-ray result in 2012. The plaintiff testified that pain prohibited her from doing things that she wanted to do. The medicine was not helping and it sometimes made her drowsy. The plaintiff reported that her vision was sometimes blurry, and she had to move things up close or far away in order to read it (Tr. 55-61). In the hearing, the plaintiff indicated that she needed to stand (Tr. 66).

The vocational expert classified the plaintiff's past work as that of housekeeper, DOT of 323.687-014, unskilled, SVP of 2, light; and housekeeper supervisor, DOT of 321.137-010, skilled, SVP of 6, light. There were no transferable skills to sedentary skilled or semi-skilled work. The ALJ proposed a hypothetical:

> [A]ssume a hypothetical individual of the claimant's age, education, past work experience and impairments of diabetes, lumbar degenerative disc disease, osteoarthritis, and cervical degenerative disc disease with the following limitations: lift and/or carry 20 pounds occasionally, 10 pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit

13

> about six hours in an eight-hour workday never climbing ladders, ropes, or scaffolds; occasionally climbing ramps, stairs, balancing, stooping, kneeling, crouching, and crawling; reaching, no overhead right reaching of the right upper extremity, other directions unlimited; avoid all exposure to hazards.

(Tr. 63).

The ALJ asked the vocational expert if the hypothetical individual could perform the plaintiff's past work. The vocational expert said he tended to think so. He paused because of the overhead restriction. He did not see why the work could not be done with the left hand, but it was going to add a burden. The vocational expert testified that the individual would require an accommodation in order to perform the plaintiff's past work. The ALJ noted that a previous vocational expert found she could not return to past work with those restrictions. The ALJ determined that the hypothetical individual could not perform the plaintiff's past work. The vocational expert reported that the ALJ could perform other work as a grader and sorter, with 1,000 jobs regionally and 52,000 jobs nationally, *Dictionary of Occupational Titles* ("*DOT*") of 789.687-146; and quality control examiner, with 3,900 jobs regionally and 120,000 jobs nationally, *DOT* of 739.687-102, light and unskilled (Tr. 63-66).

The ALJ proposed a second hypothetical:

> Assume an individual with the same vocational factors and impairments as in hypothetical number one, except that this individual is limited as stated in claimant's testimony, considering all testimony to be credible.

(Tr. 66-67).

The vocational expert stated that the second hypothetical individual could not perform any past work or any other work in the local or national economy (Tr. 66-67). The vocational expert reported that his testimony was consistent with the *DOT*. The representative asked the vocational expert for details about the jobs of grader and sorter. The vocational expert stated that they were fairly routine/repetitive types of jobs where

14

workers sorted clothes or things that had been brought to a Goodwill store, or mixed products that need to be sorted into baskets or bins. A quality control examiner's work would include checking for defects on products that were coming off a line or brought to you in a bin. The representative asked the vocational expert about an individual that would need a 20-minute break, four or five times a day. The vocational expert said that the individual would not be able to complete her duties. Also, an individual who was absent more than two days per month would not be able to work (Tr. 67-68).

## **ANALYSIS**

The plaintiff argues that the ALJ erred by (1) failing to consider all of her impairments and (2) failing to properly evaluate her credibility.

### *Residual Functional Capacity*

The plaintiff argues that the ALJ failed to consider her peripheral neuropathy and therefore failed to properly consider the combined effect of her impairments in making the residual functional capacity ("RFC") finding (doc. 15 at 14-16). Social Security Ruling ("SSR") 96-8p provides in pertinent part:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

SSR 96-8p, 1996 WL 374184, at *1. The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case

15

> record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted). Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Moreover, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

When, as here, a claimant has more than one impairment, the ALJ must consider the severe and nonsevere impairments in combination in determining whether the plaintiff is disabled. Furthermore, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). It "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity.... [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* (citing *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985)). The ALJ's duty to consider the combined effect of the plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability determination process." 20 C.F.R. §§ 404.1523, 416.923.

The medical evidence outlined above evidences the plaintiff's history of peripheral neuropathy going back to November 2010 (Tr. 525-27). The relevant time period for consideration here begins on September 8, 2012 (the amended alleged disability onset date, which is the day after the plaintiff's previous claim was denied). During the relevant time period, treatment notes show the plaintiff's reports of tingling in her foot and neuropathic pain in her legs, for which she has been prescribed gabapentin (Neurontin) (Tr.

16

425, 439, 443, 447, 449, 453, 459). In December 2012, the plaintiff continued to take gabapentin (600 mg three times a day) (Tr. 451), and Dr. Smith noted that it had helped "some" with her peripheral autonomic neuropathy (Tr. 453). In March 2013, Dr. Smith noted that the plaintiff received gabapentin through "PAP" and that it helped with tingling and pain in her feet (Tr. 429). In October 2014, Dr. Kalinsky, who treated the plaintiff's plantar fascial fibromatosis, also gave the plaintiff a "Metanx for her neuropathy" (Tr. 626-27).[3]

At step two of the sequential evaluation, the ALJ did not discuss the plaintiff's peripheral neuropathy in the discussion of her severe and non-severe impairments (Tr. 15-16). At step three, in her consideration of whether the plaintiff's diabetes met or medically equaled the requirements of the Listing of Impairments, the ALJ found that the evidence did "not show neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements or gait and station . . . ."[4] (Tr. 16). This was the only mention of neuropathy in the decision.

In the RFC assessment, the ALJ noted the plaintiff's testimony that she used a cane and that she "ha[d] problems with her feet and knees" (Tr. 17). However, in the RFC analysis and following steps of the sequential evaluation process, the ALJ did not mention

---

[3] Metanx is a vitamin B supplement indicated for the dietary management of peripheral neuropathy.

[4] The regulations provide that endocrine disorders, including diabetes, are evaluated "under the listings for other body systems." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 9.00(B)(5). The regulations further state that diabetes may cause "chronic hyperglycemia, which is longstanding abnormally high levels of blood glucose that may produce acute and long-term complications by disrupting nerve and blood cell functioning. . . . For example, we evaluate . . . diabetic peripheral and sensory neuropathies under 11.00 . . . ." *Id.* § 9.00(B)(5)(a). Listing 11.14 provides: "Peripheral neuropathies. With disorganization of motor function as described in 11.04B in spite of prescribed treatment. *Id.* § 11.14. Listing 11.04(B) states: "Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements or gait and station . . . ." *Id.* § 11.04(B).

17

the treatment notes concerning the plaintiff's peripheral neuropathy nor did she evaluate any potential limitations resulting from the condition (*see* Tr. 16-20).

The Commissioner argues that "a mere diagnosis . . . is insufficient to show that a condition results in functional limitations" (doc. 16 at 13). While the Commissioner's statement is certainly true, it does not change the fact that the ALJ apparently did not consider the medical evidence regarding the plaintiff's peripheral neuropathy in the analysis of the plaintiff's subjective complaints and the finding that the plaintiff could perform the standing and walking requirements of light work.[5] Furthermore, this is *post-hoc* rationalization not included in the decision. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir.2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

The Commissioner further argues that the objective evidence does not show that the plaintiff's neuropathy caused any limitation not already accounted for in the RFC assessment for light work (doc. 16 at 13). Again, the is *post-hoc* rationalization not included in the decision as the ALJ apparently did not consider the plaintiff's neuropathy in the RFC assessment. Similarly, the Commissioner argues that the plaintiff's neuropathic symptoms were controlled by medication (*id.* at 12). As noted by the Commissioner, the medical evidence does show that the plaintiff's dosage of gabapentin did not change during the relevant period (*id.* (citing Tr. 488)) and that the medication helped the plaintiff's neuropathic symptoms at least "some" (*see, e.g.*, Tr. 453 (12/14/2012 treatment note from Dr. Williams noting that gabapentin "has helped [the plaintiff's peripheral autonomic neuropathy]

---

[5] The regulations state that a job is classified as light work "when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b).

some")). However, again, while this is relevant evidence for consideration in the RFC analysis and assessment of the plaintiff's subjective symptoms, it simply was not discussed in the ALJ's decision.

The Commissioner also argues that the ALJ considered the plaintiff's peripheral neuropathy through the evaluation of the plaintiff's Type 2 diabetes (doc. 16 at 11-12). This argument is unavailing. While the treatment notes are clear that the plaintiff's peripheral neuropathy was a complication of or "due to" diabetes (Tr. 449), there was no assessment or evaluation in the decision of the plaintiff's neuropathic symptoms, including tingling and pain in her lower extremities.

Based upon the foregoing, the undersigned is unable to determine whether the ALJ's decision is based upon substantial evidence and therefore is constrained to recommend that the matter be remanded for further consideration of the plaintiff's peripheral neuropathy, as discussed above.[6]

***Remaining Allegation of Error***

The plaintiff further argues that the ALJ erred in finding her testimony less than fully credible (doc. 15 at 16-20). In light of the court's recommendation that this matter be remanded for further consideration as discussed above, the court need not address this issue as it may be rendered moot on remand. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments). However, as part of the overall reconsideration of the claim upon remand, the ALJ should, if necessary, also take into consideration the additional allegation of error raised by the plaintiff.

---

[6] The court expresses no opinion as to whether consideration of the evidence discussed herein will lead to different findings by the ALJ. Further analysis and discussion of the evidence may well not change the ALJ's conclusion.

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

June 22, 2017
Greenville, South Carolina